[Civ. No. 1417.    Third Appellate District.—January 7, 1916.]

## ANNIE BLOXHAM, Respondent, v. TEHAMA COUNTY TELEPHONE COMPANY, Appellant.

NEGLIGENCE—DEATH OF TELEPHONE LINEMAN—CONTACT WITH POWER LINE—SUFFICIENCY OF EVIDENCE.—In this action to recover damages for the death of the minor son of plaintiff while in the employ of the defendant in the capacity of a general telephone lineman, which death occurred while he was engaged in fastening a bracket of the defendant upon one of its poles for the purpose of stringing and making fast to such bracket a wire, and as the result of his coming in contact with an electric power wire of another company which was alleged to have been strung less than four feet from where the bracket was being attached, it is held that there was sufficient evidence to justify the jury in finding that the defendant was culpably negligent in directing the deceased to work in a place known to the defendant to be dangerous, without specially warning him of the danger and providing for his protection.

ID.—STATUTE REGULATING ELECTRIC WIRES—VIOLATION BY DEFENDANT —CONCLUSIVE PRESUMPTION AGAINST CONTRIBUTORY NEGLIGENCE— PROPER INSTRUCTION.—An instruction that if the jury found that the defendant was, in the erecting and constructing of the telephone line upon which the deceased was working at the time of his death, violating the act of April 12, 1911 (Stats. 1911, p. 1037), which prohibits the erection and maintenance above ground of any wire or cable conveying or carrying less than six hundred volts of electricity within a distance of four feet from any wire or cable which shall conduct or carry at any one time more than six hundred volts of electricity, and that if they further found that such violation of such statute contributed to the death of deceased, the law conclusively presumes that said deceased was not guilty of contributory negligence, is not erroneous.

ID.—CONSTITUTIONAL LAW—ACT REGULATING ERECTION OF POWER LINES. The act of April 22, 1911 (Stats. 1911, p. 1037), regulating the placing, erection, use, and maintenance of electric poles, wires, cables, and appliances, and providing the punishment for the violation thereof, applies to a single class of individuals or objects, and is not unconstitutional as class legislation.

ID.—EVIDENCE—SAGGING OF POWER LINE—PROOF PROPERLY EXCLUDED. In such an action it is not error to refuse evidence and instructions offered to shift the responsibility for the accident upon the power company in causing its line to sag, thus bringing it within the forbidden line of clearance, where it is shown that the power line was first erected.

ID.—PLEADING—PARTIES—APPEAL—WAIVER.—Upon an appeal from an order denying a new trial, in such action, the objection that the action should have been brought by the husband of the plaintiff cannot be considered, where the cause was tried on the pleadings as they stood without objection to the evidence in support thereof.

ID.—APPEAL—ORDER DENYING NEW TRIAL—WHAT REVIEWABLE.—The sufficiency of the pleadings to support the judgment, or the sufficiency of the findings of fact to sustain the conclusions of law, cannot be considered on an appeal from an order denying a new trial.

APPEAL from a judgment of the Superior Court of Tehama County, and from an order denying a new trial.   John F. Ellison, Judge.

The facts are stated in the opinion of the court.

H. P. Andrews, for Appellant.

J. T. Matlock, Jr., and Frank Freeman, for Respondent.

CHIPMAN, P. J.—Plaintiff seeks to recover damages for the death of Oscar Cole, her minor son, who, it is alleged in her complaint, lost his life through defendant's negligence while in its employment.   The cause was tried by the court with a jury and plaintiff had a verdict for $2,157.25, on which judgment was accordingly entered.   Defendant moved for a new trial, which was denied, and it appeals from the order.

It is alleged in the complaint that at the time of his death the said Oscar Cole was of the age of eighteen years; that his father was John N. Cole, who deserted plaintiff, his then wife, more. than ten years ago, and that she obtained an absolute

divorce from him. It elsewhere appears that plaintiff subsequently married one Zell Bloxham, who was living with her as her husband when the accident occurred, but that they were separated when the action was commenced and tried.

The circumstances attending the accident are thus alleged: "That on or about the twentieth day of November, 1911, and at the time of the death of the said Oscar Cole, he was an employee and in the employ of the Tehama County Telephone Company, in the capacity of a general telephone lineman, and at the time of his said alleged death the said Oscar Cole was engaged in fastening a bracket of the defendant company upon one of its poles for the purpose of stringing and making fast to said bracket, a wire of the said company, and that while so engaged in fastening said bracket to said pole, without any fault on his part, he came in contact with one of the electric power wires of the Sacramento Valley Power Company, a corporation, thereby causing his death, and that at the time that the said Oscar Cole was fastening the said bracket to the said pole of the said company, the distance from where said bracket was being attached by the said Oscar Cole, to the electric power wire of the Sacramento Valley Power Company, was less than four feet, and that said wire of the Sacramento Valley Power Company, at said time, was carrying more than six hundred volts of electricity, and that the said wire that was to be placed on said bracket was a wire that would carry less than six hundred volts of electricity."

It is further alleged that deceased "was uneducated and inexperienced in electricity and in building and construction work and duties of a general telephone lineman," and that defendant's agents "who were in charge of said work of construction in fastening brackets and attaching the wires thereon were uneducated and inexperienced" in the work being done, and were careless and negligent in permitting said Cole to erect its line within a distance of four feet from the electric power line of said power company and in permitting incompetent men to take charge of its construction work; that by reason of said alleged carelessness and negligence of defendant the said Cole met his death.

Defendant demurred generally to the complaint and specifically on the ground of uncertainty and "misjoinder of parties in that John N. Cole, father of said Oscar Cole, is not joined

as a party plaintiff in said action." The demurrer was overruled and defendant answered: Denied the alleged dependency of plaintiff upon said Oscar Cole; alleged that plaintiff was a married woman whose husband "was at the time of the accident and is now charged with the support of said plaintiff"; denied that Oscar Cole was, prior to his death, contributing to the support of plaintiff; denied that he was not at fault at the time of his death; denied that he was inexperienced in the work he was doing, and denied also the alleged incompetency of defendant's said agents; denied that defendant, by its alleged negligence or otherwise, contributed to the death of deceased; alleged that he fully understood the work of lineman and understood the dangers attached to such employment; that full and complete instructions were given him as to said work and as to the dangers incident thereto, and especially that he must not place brackets or construct lines within four feet of the electric power line of said Sacramento Valley Power Company; that his death was caused by his own gross carelessness which contributed proximately thereto.

It was admitted at the trial that Oscar Cole was killed on November 20, 1911, while in the employ of defendant and while ascending one of the poles of defendant preparatory to fastening a bracket thereon, by coming in contact with one of the electric power wires of the Sacramento Valley Power Company, at the town of Corning, Tehama County, and that at the time of his death he was of the age of 18 years; that defendant is the owner and managing, constructing, and operating the telephone system involved in the action; that Oscar Cole was the son of John N. Cole and Annie Bloxham, formerly Annie Cole, plaintiff in the action, and that he deserted his family, then consisting of Claudia Cole, Oscar Cole, and Elmer Cole, more than ten years ago, and plaintiff obtained an absolute divorce from said John N. Cole on the ground of willful desertion, "and for that reason the plaintiff brings this action in the place and stead of the said John N. Cole"; that the power wire of the Sacramento Valley Power Company with which the deceased, Oscar Cole, came in contact at the time of his death was carrying more than six hundred volts of electricity, and that the telephone line at that time being constructed by defendant, upon which said Oscar Cole was working, was a wire that would carry less than six hun-

dred volts of electricity; that one Wesley Holt, spoken of as Red Lewis, was defendant's foreman of the crew and "as such foreman controlled and directed the services of said Cole at the time of the accident."

Plaintiff testified that she was married to Zell Bloxham eleven years ago; that he was a blacksmith earning about $15 per week and supported her "with what he made and what Oscar made," and that the latter "contributed from twenty dollars to thirty dollars per month"; that her husband "is not now living with" plaintiff and they are separated; that deceased did all kinds of work—drove team, worked in hay fields and orchards; "that Oscar never had any experience in the duties of a telephone lineman or electricity to amount to anything; that he had not worked at that more than two months; that he received $2.50 per day; that he never attended a school where he was taught electricity."

Witness McGovern qualified as an expert in construction work on telephone and electric power lines, having, as he testified, worked at that business since 1898—"practically doing nothing else." He testified that he had known deceased "for a year around town"; that he worked for witness one or two days. He was asked if he knew whether or not deceased had any experience in electrical construction work and answered: "I know he had not. I know that he had no experience"; that he worked for witness "just a few months before his death," and that he afterward worked for defendant. He was not present when the accident occurred. He visited the scene a year later, and the situation and circumstances attending the death of deceased were explained to him substantially as shown by the evidence of witnesses then present. He was asked if a person was sent up on the pole to fasten brackets on it where they are now, how near to the power wire would it be safe for him to place himself. Over defendant's objection he testified that if the man wasn't capable, he "should judge about four feet. Q. You say a man would have to be away four feet? A. No, sir; if the man was a practical man he would go up and put on the brackets if the wire was within six inches, if he knew how to handle himself. . . . If he had a four feet clearance it wouldn't be dangerous. . . . Q. Well, suppose there was about an eighteen or nineteen inch clearance, what would you say then? A. If he wasn't a practical man it would be

a dangerous place for him to work. Q. What would you say about sending a man like Oscar Cole up there? A. I wouldn't send him up there because I don't think he was competent to do it. Because he had no experience.''

Witness George Duncan was one of the men working with deceased. He testified that they had been on the job about one week or ten days running a line from Red Bluff to Orland and had reached Corning, where the accident occurred. He was an eye-witness to the accident, and described it as follows: ''We were working on the second street south from the Maywood Hotel, either the second or third on the lower end of the town toward the railroad track. He went up to put some brackets for the telephone line and he went up there and put his leg over the messenger wire which was grounded and put his belt around the pole and leaned back to snap the belt to the pole, and when he leaned back he leaned right against the power wire which was behind him. I think it was Sacramento Valley Power Company's power wire. Think he was about twenty-five feet from the ground. He went up the pole to put some brackets on, which he was to put above the messenger wire. Wesley Holt told him to go up there. I had just finished nailing on some brackets on the pole I was on. The pole I was on was across the street from the one Cole was on, west and north of him. When I had nailed my brackets on I stayed there under the pole in position to sight him with his bracket under the power line. I was directed to do this by Holt. He ordered me to sight him in to clear this power wire. It was the one on which Cole was killed. I had orders to sight there nearly on the level or get the brackets in line to clear this power wire between the poles that the lines wouldn't come in contact with each other. I don't think the power wire was more than eighteen inches from the pole where he was to nail the brackets. I didn't measure it, I just guessed at the distance. When I was sighted I told Cole there wasn't clearance enough. He said there was. I don't remember having any instructions as to the distance the telephone wire was to clear the power wire. I didn't hear any instructions given Cole on that point, but I heard Holt instruct Cole to be careful about the power. That is as much as I can remember at the present time. Before that I hadn't had but very little experience in power, scarcely any. I had considerable experi-

ence in telephone work. I had been working at telephones off and on since 1906, but had not had scarcely any experience with power wires. I don't know how much experience the other men working with me had. When Cole struck the power line he fell limp out over the wire. I hollered to the other boys as soon as I saw it; they started to run down there and then they went back the other way to the substation and shut the power off. I don't believe it was eighteen inches from the messenger wire to the power wire." The witness was asked how a man who understood his business should proceed in what deceased was doing. "A. Well, he should have stopped and buckled on before he got up to this messenger. He should have buckled on the safety belt around the pole and put himself in position to work. Touch-the wire (the power wire) caused Cole's death." On cross-examination he testified: "Q. Mr. Duncan, Mr. Holt had directed you to see that there was sufficient clearance before nailing on the brackets, had he not? A. Well, he didn't specify just that manner. He asked me to sight through there and sight under the power. To sight young Cole under the power was the orders he gave me. This was for the purpose of giving sufficient clearance. Our instructions were to go up there and put the brackets on and my instruction was to sight him in for this clearance. I did sight for clearance and told Cole that there wasn't sufficient clearance." On re-examination he testified: "I was instructed to clear this power and this messenger. That was as much as I know of it. I wasn't specified any particular distance that I was sighting for placing a bracket on which a telephone wire would be placed. It couldn't have been placed anywhere on that pole and had perfect clearance from the power wire." On re-cross he testified: "I was there after the death of Cole until the body was removed and it had been taken to the morgue. Later in the day there was considerable more clearance between the messenger wire and the power company's wire. Later on that day, it was about twenty minutes after the accident, the slack was straightened out of the Sacramento Power wire. It was done by a Sacramento Valley wire man. He drew up the slack immediately after the accident, and after he drew it up there was plenty of space for a man to work but wasn't four feet, but there was considerable difference in space. . . . There were no brackets nailed on the

pole on which Cole was killed that day." The witness testified that about ten days later he saw the pole, "and the brackets and wires were strung on it"; that the messenger wire, "just guessing at it, it was somewhere in the neighborhood of four feet, but whether over or under" he could not say; "the telephone wire was about fourteen or sixteen inches above the messenger."

Witness Charles Bertholas, foreman of the Northern California Power Company, formerly worked for the Sacramento Valley Power Company and had its lines constructed where Cole was killed. He testified that the wires are higher today than when he left Corning. The place where Cole was working when he was killed was pointed out to him and he testified that it would be a dangerous place to send a man with "two months' experience in telephone work." He testified that the power line wire carried seven thousand two hundred volts.

Witness Robert Stewart, "engaged as an electrician by the North California Power Company," who "had worked for the Pacific Gas in construction work for six years," testified that he knew Oscar Cole by sight during his lifetime and knew where he was killed; that he saw him while he was on the pole, dead; that the messenger wire of the telephone company was about three feet from the power wire at the time Cole was killed. "Q. Well, how far was the brackets—if those brackets were on that pole at the time Cole was killed, at the same place they are now, how far would they have been then from the power wire?" Objected to on the ground that "the evidence shows that there were no brackets on there at the time Cole was killed." Objection overruled. "A. About eighteen inches." He testified "that there was no place above the messenger wire four feet from the power wire and it didn't make any difference where a man would nail if it was above the messenger, it would be within the four-foot limit." He testified that where Cole was working was a dangerous place for a man of only two or three months' experience. He also testified that "the distance between the wires on the poles at this time are the same that they were then."

Witness Melvin Kingsley was local manager of defendant company in November, 1911; "that he saw Cole at the telephone pole after his death; that he saw him taken down;

that witness had the two brackets that are now on the telephone pole nailed there a day or two after Cole's death and the wires were strung on''; that he was directed by Manager Reeves to nail them on; that he received no instruction as to the distance the wires should be from the power wire and he did not measure the distance and does not know whether they were four feet apart or not.

Witness De la Montanya, for defendant, was one of the crew working with deceased. He helped take deceased down from the pole but did not witness the accident. He testified that he ''heard foreman Holt give instructions to be careful as to the danger of the power lines several times; I heard him give instructions to that effect to Cole the day before the accident happened; this was in reference to the high voltage power lines in Corning.'' He testified that he did not measure the distance between the high voltage power line and the cable of the telephone company, but he believed there was room enough for Cole to work safely; his estimate of the distance was three feet; his theory of the accident was that ''when he buckled the belt he threw his hand around with the snap and then is when I think he came in contact with the wire with his thumb''; he said there was a slack in the power wire that brought it nearer to the telephone cable and that ''right after he was killed the slack was pulled up.''

Witness Duncan was called for defendant and testified ''that it was Cole's thumb that came in contact with the wire and not the other part of his body; his hand was behind him, along the side of him like; we had not completed the work where Cole was.''

Defendant's foreman, Holt, testified that Cole commenced work on the Red Bluff and Orland line November 15, 1911; that he instructed Cole, as he did ''all the rest of the boys in the gang, to be very careful while working, particularly in the town of Corning, about coming in contact, or bringing their person in contact with any voltage wires while being in contact with grounded messengers''; that he read the recent law on the subject of placing wires; when Duncan went up his pole I told him to sight and see how the power wires were. Of course, going along in his duties it would be necessary to put brackets on, and Cole went up his pole without my directing him, but he knew it was in his force of duty, as he had been doing from day to day going along. I told

Duncan to sight through for clearance at that point for Cole . . . to see whether they (the power wires) would interfere with us in any form or manner through there''; that at the time of Cole's death witness was four or five poles east of him; that Duncan called him when the accident happened and he went to his assistance; that ''he saw the condition of, the power wires at the time Cole was taken down from the pole and saw it subsequent to that time on the same day and that the condition had changed; that the wire had in the meantime been cut and pulled up; that he didn't measure the distance but that the distance of clearance was much greater after the slack was pulled up and the clearance was greater than before.'' There was evidence that according to the survey of the line which Holt was given to work by he found that in several places it would bring the line in contact with the power line and he changed the location upon his own judgment; that at a point south of the place where Cole was killed the company ran its line at a crossing between two power lines not more than five feet apart.

A map or plat showing the location of the poles, wires, etc., immediately at the scene of the accident was introduced but does not appear in the record. It probably made clear to the jury evidence otherwise more or less obscure. The office of the ''messenger wire,'' spoken of by witnesses, is not explained. Whatever its use, it was there as part of the construction work, was connected with the pole on which Cole was working and was ''grounded,'' i. e., became a conductor of electricity brought in contact with it. The brackets, as we understand the evidence, were the wooden fixtures to be nailed to and projecting from the poles and to which the wire was fastened. It is not made clear just where the pole was situated, on which Cole was working, with reference to the power line poles. Judging from the significance given' to the slack in that wire, we infer that this pole was midway between the poles carrying the power line wire, and hence the slack or sagging in that wire brought it nearer the pole which Cole ascended. We have, then, from the evidence this situation: Cole was sent to work with directions to nail brackets on a pole at a point above the messenger wire, which latter, witnesses testified, was eighteen or nineteen inches from the power wire; one of defendant's witnesses said it was three feet, while others, not giving exact distance, testified

that at no point above the messenger wire was it possible to place a bracket which would leave a "clearance" between it and the power wire of four feet. The relative position of these various objects was well known to defendant's agents. Expert witnesses, familiar with this sort of work and its risks, testified that, to a person inexperienced or not capable, the place where Cole was sent was dangerous. Cole had no experience in electrical construction and but a short time as telephone lineman, an employment in itself dangerous, and being without experience, the risk necessarily proved fatal to him. He had been instructed, as defendant's witnesses testified, to be careful not to come in contact with a power wire, which may be conceded, and still it would not relieve defendant from the charge of negligence in sending him to work in a place known to defendant to be dangerous without specially warning him of the danger and providing for his protection. This would be true under the general law governing such cases, and particularly so under existing statutes making it a misdemeanor to construct a telephone line, carrying less than six hundred volts of electricity, within four feet of a power or other line carrying more than six hundred volts—in this instance carrying more than seven thousand volts.

Cole seems to have done the thing naturally suggesting itself to one of his experience acting under the orders of his superior. He climbed the pole, threw a leg over the messenger wire, and was fastening his belt to the pole to support himself while nailing on the brackets. In doing so he came in contact with the power line wire, thus forming a circuit with the grounded messenger wire on which he was resting, and was killed. Whether he was guilty of contributory negligence is a question apart from defendant's negligence and will be noticed later. We think there was sufficient evidence to justify the jury in finding that defendant was culpably negligent. We are also of the opinion that had the court not taken from the jury by its instructions the question of Cole's negligence as the proximate cause of his death, now claimed as error by defendant, the circumstances were such as would have justified the jury in finding that defendant failed to establish this defense. The court, however, instructed the jury as follows:

"You are instructed that the statute law of this state makes it unlawful for any commission, officer, agent, or employee

of the state of California, or of any city and county, or city or county, or other political subdivision thereof, or any person, firm, or corporation, to run, place, erect, or maintain above ground, within a distance of four feet from any wire or cable which shall conduct or carry at any one time more than six hundred volts of electricity, any wire or cable conveying or carrying less than six hundred volts of electricity, and that the statute above referred to in this instruction was enacted for the safety of employees, and in this connection I charge you that if you find the Tehama County Telephone Company, at the time of the killing of Oscar Cole, was, in the erecting and constructing of the telephone line upon which Oscar Cole was working at the time of his death, violating such statute law, and you further find from the evidence that such violation of such statute contributed to the death of said Oscar Cole, then, and in that event, the law conclusively presumes that said Oscar Cole was not guilty of contributory negligence, and you must so find.''

Defendant challenges the soundness of this instruction on the ground that the statute authorizing it is unconstitutional ''as class legislation.'' The act of April 8, 1911 (Stats. 1911, p. 796), went into effect September 1, 1911. Section 1 reads as follows:

''In any action to recover damages for a personal injury sustained within this state by an employee while engaged in the line of his duty or the course of his employment as such, or for death resulting from personal injury so sustained, in which recovery is sought upon the ground of want of ordinary or reasonable care of the employer, or of any officer, agent or servant of the employer, the fact that such employee may have been guilty of contributory negligence shall not bar a recovery therein where his contributory negligence was slight and that of the employer was gross, in comparison, but the damages may be diminished by the jury in proportion to the amount of negligence attributable to such employee, and it shall be conclusively presumed that such employee was not guilty of contributory negligence in any case where the violation of any statute enacted for the safety of employees contributed to such employee's injury; and it shall not be a defense:

'' (1) That the employee either expressly or impliedly assumed the risk of the hazard complained of.

29 Cal. App.—22

"(2) That the injury or death was caused in whole or in part by the want of ordinary or reasonable care of a fellow-servant."

The act of April 22, 1911 (Stats. 1911, p. 1037), "regulating the placing, erection, use and maintenance of electric poles, wires, cables and appliances, and providing the punishment for the violation thereof," in its first section provided that "No commission, officer, . . . and no other person, firm, or corporation shall . . . (c) Run, place, erect or maintain, above ground, within the distance of four (4) feet from any wire or cable conducting or carrying less than six hundred volts of electricity, any wire or cable which shall conduct or carry at any one time more than six hundred volts of electricity, or run, place, erect or maintain within the distance of four (4) feet from any wire or cable which shall conduct or carry at any one time more than six hundred volts of electricity any wire or cable conducting or carrying less than six hundred volts of electricity." Section 4 provides: "Any violation of any provision of this act shall be deemed to be a misdemeanor, and shall be punishable upon conviction by a fine of not exceeding five hundred dollars ($500.00) or by imprisonment in a county jail not exceeding six (6) months or by both such fine and imprisonment." This act by its terms went into effect "six months from the date of its passage in so far as it relates to new work." Both acts were, therefore, in effect when Cole was killed.

We do not feel called upon to discuss the constitutionality of these acts. They clearly apply to a single class of individuals or objects, and apply uniformly to all of the class and, we think, fall within the principles enunciated in *Pasadena* v. *Stimson,* 91 Cal. 238, [27 Pac. 604], and numerous subsequent cases on the subject. See the discussion in the recent case of *City of Sacramento* v. *Swanston, ante,* p. 212, [155 Pac. 101].

The instruction complained of was not error. If a case may be supposed where the conduct of the injured party was so grossly negligent as to place him beyond the pale of the protection given by the statute, this was no such case. There is no merit in the contention that the statute is intended solely "for the protection of the general public, for the patrons of telephone companies, etc." In our opinion, it was intended to apply to just such a case as we have here, and, under the

uncontradicted facts, the court was justified in instructing the jury that "if you find that the defendant was, in the erecting and constructing of the telephone line upon which Oscar Cole was working at the time of his death, violating such statute law (referred to in the instruction), and you further find from the evidence that such violation of such statute contributed to the death of said Oscar Cole then, and in that event, the law conclusively presumes that said Oscar Cole was not guilty of contributory negligence, and you must so find."

Error is claimed in the court's refusing evidence and instructions which were offered to shift the responsibility for the accident upon the power company in causing its line to sag, thus bringing it within the forbidden limit of clearance. The court was clearly right in its ruling. The power line was erected before defendant's line was started, and defendant knew, or should have known, that at the point involved the power line was dangerously near where defendant was locating its line. The duty of defendant, obviously, was to adapt its line to the situation in which it found the power line, or first causing the power company to take up its slack if that would have removed the danger. In no sense was the power company liable nor could it be made the scapegoat of defendant. It was not error, therefore, for the court to instruct the jury, "That the Sacramento Valley Power Company has nothing to do with this case, and their neglect, if any, is no defense in this action; the defendant here is bound by the conditions existing as found at the time of the accident."

We have given careful attention to alleged errors in ruling upon evidence offered and find none calling for special consideration. Some objections were made to instructions given, not already noticed, and to instructions offered by defendant and refused by the court. The instructions given were full and correctly presented every essential element and issue in the case. We find no error in any given or refused.

Finally, it is urged that the order must be reversed for the reason that the action should have been brought by plaintiff's husband. The argument is that "the character of the property, which consisted of a chose in action, as community property or separate property, is governed solely by the statute"; that it appeared by the answer and by the evidence

that plaintiff is a married woman whose husband was living with her when her son was killed; that the earnings of the son went to support the family—the community; that the loss of this support constituted damages and the damages accruing became community property, not having been acquired by gift, devise, or descent.''

The question cannot be considered on this appeal. The demurrer claimed a misjoinder of parties plaintiff because plaintiff's former husband and the father of the deceased was not made a party. The answer alleged that plaintiff is a married woman and was such at the time of the accident, ''and that her husband was at all times mentioned in said complaint fully able and willing to support the said plaintiff and did so support said plaintiff.'' No suggestion is made that he should have brought the action. The cause was tried on the pleadings as they stood without objection to the evidence in support thereof. The appeal from the judgment was not taken in time to avail the appellant.

The grounds stated in the motion for a new trial were: 1. Insufficiency of the evidence to justify the verdict; 2. That the verdict is against law; 3. Errors in law occurring at the trial; 4. Excessive damages appearing to have been given under the influence of passion and prejudice.

The sufficiency of the pleadings to support the judgment, or the sufficiency of the findings of fact to sustain the conclusions of law, cannot be considered on an appeal from an order denying a new trial. (*Swift* v. *Occidental etc. Co.*, 141 Cal. 161, [74 Pac. 700]; *Sharp* v. *Bowie*, 142 Cal. 462, [76 Pac. 62]; *Hoover* v. *Wolfe*, 167 Cal. 337, [139 Pac. 794].)

The appellate court is limited in its review of the action of the lower court, on appeal from the order denying a new trial, to the grounds upon which the new trial was asked. (*Wheeler* v. *Bolton*, 92 Cal. 159, [28 Pac. 558].)

The only ground made the basis of the motion for a new trial having any application to the point now raised is ''that the verdict is against law.'' In discussing the office of new trial when sought on the ground that the decision is against law, it was pointed out, in *Swift* v. *Occidental etc. Co.*, 141 Cal. 161, [74 Pac. 700], that where a new trial could afford no relief, and other and effective means of relief are expressly provided in the Code of Civil Procedure (secs. 663 and 663½), the motion for a new trial is necessarily overruled.

An example is thus given: "Where the findings are full and complete as to all the issues and fully sustained by the evidence, but the conclusions of law are erroneous or misapplied in framing the judgment. In such a case," said the court, "it is plain that a new trial—a re-examination in the same court of the issues of fact, or some of them (Code Civ. Proc., sec. 656)—would accomplish nothing, whereas a motion in pursuance of section 663 to vacate or correct the judgment would secure appropriate relief in the trial court, or if relief was denied there, it could be secured by an appeal from the judgment." (Id.) And it was held that a motion for a new trial is not a means of correcting the error in the decision where the only fault in the findings is that they do not support the legal conclusions drawn from them, and still less is it a means of remedying a fault in the pleadings or an error in granting relief not warranted by the pleadings. (Id.)

"A new trial is a re-examination of an issue of fact in the same court after a trial and decision." (Code Civ. Proc., sec. 656.) "The question whether the judgment is authorized by the pleadings or findings cannot be agitated on the motion for a new trial, for it is not involved in a re-examination of the issues of fact. . . . The question whether the issues of fact were correctly found does not depend in any manner on the question whether a pleading states sufficient facts to entitle a party to the relief granted by the judgment or whether the issues as found sustain the judgment." (*Martin* v. *Matfield*, 49 Cal. 45; *In re Doyle*, 73 Cal. 564, 571, [15 Pac. 125].) It was hence held, in *Brison* v. *Brison*, 90 Cal. 323, [27 Pac. 186], that, upon an appeal from an order denying a new trial, the court "can only review the action of the court below, we cannot consider whether the findings are sufficient to sustain the judgment, and that our examination of the evidence is limited to a consideration of its sufficiency to sustain the findings of fact."

It is not now claimed that the damages awarded were excessive.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.